Jehu P. EVANS, by his next friend, Preston E. Evans, Plaintiff,

v.

The PENNSYLVANIA RAILROAD COMPANY, a corporation of the State of Pennsylvania, Defendant.

Margaret Elizabeth JESTER, Widow, Plaintiff,

v.

The PENNSYLVANIA RAILROAD COMPANY, a corporation of the State of Pennsylvania, Defendant.

Noah Kenneth COLLINS, Plaintiff,

v.

The PENNSYLVANIA RAILROAD COMPANY, a corporation of the State of Pennsylvania, Defendant.

Leland Kenneth PHILLIPS, an infant, by his next friend, Leland Buckson Phillips, Plaintiff,

v.

The PENNSYLVANIA RAILROAD COMPANY, a corporation of the State of Pennsylvania, Defendant.

Civ. A. Nos. 1792, 1795, 1796, 1823.

United States District Court
D. Delaware.

Aug. 15, 1957.

**16.**

James M. Tunnell, Jr. (of Tunnell & Tunnell), Georgetown, Del., for plaintiffs.

William S. Potter and James L. Latchum (of Berl, Potter & Anderson), Wilmington, Del., for defendant.

CALEB M. WRIGHT, District Judge.

These cases were consolidated for trial before this court without a jury. The plaintiffs are citizens of the State of Delaware and the defendant is a corporation of the Commonwealth of Pennsylvania. The amount in controversy in each case exceeds $3,000 exclusive of interest and costs.

During the early evening of May 20, 1955, four young men, William N. Daniels, Noah Kenneth Collins, Leland Kenneth Phillips and Marvin Jester were cruising aimlessly around Milford, Delaware in Daniels' 1952 Oldsmobile. At or about 8:00 p. m. these four young men asked Jehu Evans to join them.[1] Evans accepted the invitation.

The five rode around Milford until somewhere between 8:15 p. m. and 8:45 p. m.[2] Leaving Milford, the Daniels car

---

1. R. 274, 326, 327.

2. R. 306, 353, 366.

headed toward Rehoboth Beach on Delaware Route 14,[3] and then cut off Route 14 to go to Milton, Delaware.[4] After riding around the school at Milton where a Prom was in progress, the five started back to Route 14 via the road between Broadkill Beach and Milton.

Outside of Milton, about two miles from Route 14,[5] Daniels stopped the car so that the five, who had been drinking beer from the time they left Milford, might heed a call of nature.[6] As the young men resettled themselves in the Daniels car, an unidentified car proceeding in the same direction as the Daniels vehicle, passed the halted Daniels car.[7]

The unidentified vehicle proceeded to the intersection of the Broadkill Beach-Milton road and Route 14, coming to a complete stop before turning south on Route 14.[8] The Daniels vehicle likewise turned south on Route 14 and was following the unidentified car at a distance of a quarter mile, more or less, as they approached the village of Nassau.[9]

The two cars entered Nassau at or about 10:00 p. m. and approached an intersection formed by the tracks of the Pennsylvania Railroad and Route 14. Stopped on the other side of the track with the headlights of his vehicle burning was one Alexander Vann.[10] The car preceding the Daniels vehicle swerved to the left and its tail lights were obliterated from Daniels' view [11] by a locomotive silhouetted by Vann's lights [12] as it proceeded to slowly cover the entire roadway from west to east.[13] Daniels, being anywhere from 100 to 160 feet from the crossing when he perceived the locomotive beginning to obstruct his path,[14] applied the brakes,[15] causing the tires to squeal.[16] At about this same time, Phillips hollered.[17] The Daniels car skidded to its left [18] on the road made wet by rain,[19] and went careening toward the locomotive. At or near the center of Route 14,[20] the left front of the Daniels car struck the front of the cabin car. This first contact was followed by a second impact as the side of the car whipped around to strike the rear end of the locomotive which was hooked immediately in front of the cabin car.[21]

At the time of the accident Evans was on the back seat directly behind Daniels, the driver. To the right of Evans on the back seat in the center was Jester, and on Jester's right, Collins. On the front seat beside Daniels was Phillips.[22]

Nassau crossing had claimed at least its sixth accident in less than three years [23] and at least its second fatality. Marvin Jester, born on the ninth day of May, 1934,[24] was killed, leaving a young widow with an eight week old child. His wife, the plaintiff, was born on the fourth day of March, 1935.[25] According

3. R. 262–263, 276–277.

4. R. 366–367.

5. R. 279.

6. R. 279, 307.

7. R. 279, 307, 370–371.

8. R. 280.

9. R. 280.

10. R. 597.

11. R. 264.

12. R. 266.

13. R. 558, 559, 623. The train was going about 6 miles per hour.

14. R. 266, 267, 268, 285, 286, 298.

15. R. 269, 359.

16. R. 660.

17. R. 269, 310.

18. R. 269, 359–360.

19. R. 281, 361, 496, 543, 561, 572–574, 628.

20. R. 384, 385, 489, 625, 653, 663.

21. R. 472–476, 498–499, 625, 627–628, 642–646, 653, 667–668.

22. R. 259–260, 302.

23. R. 228–229 Arthur Labe.
 R. 235–236 William S. Morris.
 R. 240–243 Thomas Erwin Schlegal.
 R. 249–250 Medford S. King.
 R. 313–314 Thomas J. Sweeney, Jr.
 R. 258 Gay's Administrator v. Pennsylvania R. R., 2 Cir., 1952, 199 F.2d 370.

24. R. 147.

25. R. 147.

to the mortality tables published by the United States Department of Health, Education and Welfare, the "joint" life expectancy of Marvin Jester and his wife, as of May 20, 1955, was 43.47 years.[26]

At the time of his death, Marvin Jester was earning a net "take-home" pay of $50 a week, of which he spent $8 for the support of their child, Marvin Jester, Jr., and $20 for the support of Margaret Jester, his wife.[27] Had he lived, he would probably have continued to do about the same for his wife for the rest of his life (which would have brought him to the age of 64½ years) and for his child until the said Marvin Jester, Jr., reached the age of 16 years.

The amount of money, invested on May 20, 1955, at 4% interest—which the court finds to be a reasonable rate—and drawn upon to the extent of $1 per week continually throughout the joint life expectancy of Marvin Jester and Margaret Jester, and exhausting all interest and all the principal of the said sum at the end of that joint expectancy, would be $1,084. On that basis the present value of the expectancy of her own support which she lost by reason of her husband's death is $21,680.[28]

Plaintiff and her deceased husband had an infant child, Marvin Jester, Jr., who had been born on March 17, 1955,[29] and was about eight weeks old at the time of the father's death.[30] Marvin Jester left no net estate,[31] and, as a consequence of the father's death, the burden of supporting this child was and hereafter will be thrust upon the mother until the child is sixteen years of age.

The amount of money, invested on May 20, 1955, at 4% interest and drawn upon to the extent of $1 per week continuing until Marvin Jester, Jr., born March 17, 1955 attains the age of sixteen, and exhausting all interest and all of the principal of the said sum upon attaining the age of sixteen would be $613. The present value of such income at $8 weekly is $4,904.[32]

Jehu Evans sustained severe shock, fracture of the right frontal bone of the skull [33] in the region of the frontal sinus and orbit, perforation of the left ear drum,[34] fracture of the facial bones, fracture of the left clavicle, loss of one kidney,[35] the opening of a fistula between the brain and the nose, brain contusion, loss of a great deal of the brain tissue in the region of the frontal lobe,[36] and multiple abrasions, contusions and lacerations, all of which resulted in permanent blindness in one eye,[37] permanent loss of the sense of smell, permanent ataxia of the legs, feet, hands and arms, permanent spasticity on the left side,[38] permanent motor impairment of the legs and arms, and permanent impairment of muscular coordination, and permanent disturbance of his sense of balance,[39] so that he staggers, and always will stagger, in the fashion of a drunken man,[40] permanent impediment of his speech and permanent deprivation of certain of the sexual functions, so that he can never have children.[41]

In an effort to have Jehu Evans cured of his injuries, he and his parents, who are also plaintiffs, have heretofore necessarily incurred reasonable medical, nursing and hospital expenses, which up to the date of the trial were as follows:

26. R. 456.

27. R. 140–142. PX 47.

28. PX 55.

29. R. 147.

30. R. 139.

31. PX 48.

32. PX 55.

33. R. 9.

34. R. 17.

35. R. 69.

36. R. 32.

37. R. 45, 51.

38. R. 48.

39. R. 43, 51.

40. R. 47, 51, 84.

41. R. 87.

| | |
|---|---:|
| Beebe Hospital | $ 755.95 [42] |
| Delaware Hospital | 1,767.65 [43] |
| Milford Hospital | 60.00 [44] |
| Nurses | 3,062.62 [45] |
| Lewes Ambulance | 5.00 [46] |
| Dr. Dickey and Dr. Marvil | 10.00 [47] |
| Dr. Heckler | 15.00 [48] |
| Dr. Grossman | 50.00 [49] |
| Dr. Lamotte | 10.00 [50] |
| Beebe Clinic, Inc. | 150.00 [51] |
| Dr. Livio Olmedo | 350.00 [52] |
| Dr. Mick | 15.00 [53] |
| Miscellaneous drugs supplied and equipment | 93.07 [54] |
| Dr. Stambaugh | 35.00 [55] |
| Dr. Olmedo | 25.00 [56] |
| Beebe Clinic | 3.00 [57] |
| Beebe Clinic | 50.00 [58] |
| Beebe Clinic | 150.00 [59] |
| Beebe Hospital | 488.50 [60] |
| Milford Hospital | 34.00 [61] |
| Telephone bills | 20.99 [62] |
| | |
| Total | $7,150.78 |

Aside from the above bills as rendered and paid, two of the doctors gratuitously reduced their charges in the further amounts listed below, this being done because of the financial circumstances of these plaintiffs, and the bills being reasonable in amount before such downward adjustment:

| | |
|---|---:|
| Dr. James Beebe, Jr. | $ 350.00 [63] |
| Dr. Livio Olmedo | 400.00 [64] |
| | |
| | $ 750.00 |

The parents of Jehu Evans, who are also plaintiffs, rendered necessary nursing services, without submitting any bills to their son for the same, which services were reasonably worth the following amounts:

| | |
|---|---:|
| $27.00 per day [65] for three months, until Jehu regained bowel control [66] and could begin to feed himself | $2,440.00 |
| For 50 further weeks (to trial) at $70.00 per week [67] | 3,500.00 |
| | |
| Total | $5,940.00 |

At the time of his injury, Jehu Evans was employed by Victor Lynn Lines, Inc., at an average salary [68] of $50.00 per week. Up to the date of trial, at that same salary, his lost earnings would have been $3,878. This boy, however, was a very satisfactory employee and before his injury had excellent chances for advancement [69] and substantially higher salaries. See Turcol v. Jenkins.[70] His condition is now such that he will never be able to procure regular employment. He will be able to

42. PX 1.
43. R. 130; PX 2.
44. PX 3.
45. PX 4.
46. PX 5.
47. PX 6.
48. PX 7.
49. PX 8.
50. PX 9.
51. PX 10.
52. PX 11.
53. PX 12; PX 45.
54. PX 46.
55. PX 13.
56. PX 14.
57. PX 15.
58. PX 16.
59. PX 17.
60. PX 18.
61. PX 19.
62. R. 136.
63. R. 83.
64. R. 54.
65. R. 84.
66. R. 115–118, 120.
67. R. 125.
68. R. 391.
69. R. 391.
70. 1956, 10 Terry, Del., 596, 599–600, 122 A.2d 224, 225–226.

work, but it will take him about eight hours to do what a normal person would do in three.[71] He can probably earn an average salary of $15 per week. His probable earnings throughout his life, if he had not been injured in this accident, would have been $75 per week. His life expectancy was 48 years at the time of trial. The present value of $1 per week payable during the expectation of Jehu Evans' life is $1,124 at 4% interest yielding an amount of lost future earnings for the remaining years of his life of $67,440.[72]

Jehu Evans, in the course of his hospitalization and treatment to date, has undergone great pain and suffering, He had to have an emergency tracheotomy to keep him from strangling.[73] For nineteen weeks he had a permanent catheter. His skull was punctured, and three or four times his brain was penetrated with a needle, injecting his brain[74] with an antibiotic drug in order to halt the attack of spinal meningitis which threatened to be fatal. He had to be kept immobile in a Stryker frame for thirteen days. For many weeks following that he was unable to sit up or to feed himself and undoubtedly in the course of all these hospital and surgical treatments, as well as the rough and tumble of trying to relearn to walk, he continued in great discomfort. A fair monetary value for pain and suffering past, present and future is $25,000.

Leland Kenneth Phillips suffered bruises on his chest, eyes and elbow,[75] and pain and suffering for approximately four weeks.[76]

Plaintiff was required to spend the following sums, which are found to be reasonable, for treatment of his injuries:

| | | |
|---|---|---|
| Beebe Clinic | $ | 29.00 [77] |
| Beebe Hospital | | 49.75 [78] |
| Total | $ | 78.75 |

The plaintiff further lost work from the date of the accident until June 28, 1955, being five weeks of work at an average weekly wage of $59.65, or a total loss of earnings of $298.35.[79] A fair monetary value for his pain and suffering for four weeks is $500.

Noah Kenneth Collins was injured by the fracture of the left frontal bone of his skull, extending into the sinus, by fracture of the left maxilla, concussion of the brain,[80] and he suffered from shock.[81] These injuries were such as required him to stay in the Beebe Hospital for three weeks.[82] He was discharged to rest at home for a ten-day period and ordered by his physician not to work for a further period of at least one month.[83] He suffered numbness in his face[84] and teeth on the left side.[85] and will ultimately lose two teeth.[86] Further, this plaintiff emerged from this injury with a deviated septum, caused by this accident, and this condition will require another operation.[87]

Plaintiff incurred the following expenses, which the court finds to be reasonable, for medical treatment, nursing and hospitalization in an effort to be cured of his injuries:

---

71. R. 49–51, 52.

72. PX 55.

73. R. 13.

74. R. 39.

75. R. 106–110.

76. R. 108.

77. PX 24.

78. PX 25.

79. R. 363.

80. R. 94.

81. R. 91.

82. R. 95.

83. R. 95.

84. R. 320.

85. R. 95.

86. R. 103.

87. R. 103, 104.

Beebe Clinic $ 120.00 [88]

Beebe Hospital 233.25 [89]

Dr. Dickey 10.00 [90]

Dr. Beebe's "mark down" of his bill 130.00 [91]

Necessary future operation on deviated septum 300.00 [92]

Total $ 793.25 [93]

Plaintiff, besides past pain and suffering, has suffered a "twitching" [94] in his face, and had and still has, periodical headaches,[95] all resulting from the said injuries, for all of which a fair valuation in money would be $5,500.

Plaintiff further was forced to lose employment and/or to work at a less lucrative job,[96] resulting in a diminution of income in the amount of $1,551.23.

Nassau crossing was extremely hazardous to motor vehicle traffic. The volume of automobile traffic on Delaware Route 14 was relatively heavy.[97] It was difficult for automobile traffic to see approaching trains especially when the automobile was going south and the train was approaching from the west. This difficulty was caused by the northwest angle formed by the road and train (58° 30')[98] and obstructions, such as a warehouse, home and shrubbery, which prevented the automobile and train from seeing each other,[99] until both were relatively close to the intersection formed by the highway and the track.[100] The effect of obstructions to view was further magnified by the color of the locomotive which appeared to be black to three Delaware State Policemen investigating the accident.[101] Despite its dark color and concealment from auto-

88. R. 101; PX 21.

89. PX 22.

90. PX 44; R. 99.

91. R. 101.

92. R. 105.

93. Not included in this total is nursing by mother since there is nothing in the record to show reasonable value of this service.

94. R. 320.

95. R. 320, 321.

96. R. 318.

97. R. 550-551. The average daily volume of traffic for the year of the accident and the years preceding was:

| 1950 | 2410 | cars |
|------|------|------|
| 1951 | 2845 | " |
| 1952 | 3078 | " |
| 1953 | 3360 | " |
| 1954 | 3506 | " |
| 1955 | 3700 | " |

The month of May was average or slightly above average, R. 167, 168, 169, 414.

On the other hand, the Railroad had no particular set schedule or time for crossing at Nassau, R. 398-399, 556. The crossing at Delaware Route 14 was generally traversed twice at night, anywhere between three nights and six nights per week at a regular hour, R. 398.

98. Plaintiffs' Interrogatory No. 35 and Answer thereto.

99. R. 186, 189, 191, 202-204, 210-211, 340, 351.

100. From a point 176 feet north of the track on the highway, one can see 86 feet of trackage to the west of the highway and vice versa, R. 516-517.

From a point 74 feet north of the track on the highway, one can see 164.5 feet of trackage to the west of the highway and vice versa, R. 517.

From a point 22 feet north of the track on the highway, one has practically unlimited vision of trackage, R. 517-518.

Similarly, visibility from the locomotive was equally bad if not worse. The only observer to the north, the direction from which the five were coming, would be the one sitting in the fireman's seat, R. 400. At Nassau crossing, when the front of the locomotive was at the near edge of the paved portion of the road, a person sitting in the fireman's seat could only see approximately 150 feet to 200 feet north, R. 403-404. When the front part of the engine reached the center of the road, one in the fireman's position in the locomotive could definitely see north to New Road which was 157 feet from the track, R. 404-405. Not until the front of the locomotive completely covered both lanes of Route 14 could the fireman see north 200 to 300 yards, R. 405.

101. R. 416, 471, 497.

mobile traffic, the train was very poorly lighted for purposes of disclosing itself to those who would cross its path.[102]

Delaware Route 14 was straight and level on the approach to the intersecting track.[103] Warnings to vehicles approaching this extremely hazardous crossing from the north consisted of five State Highway signs,[104] two of which warned of the Railroad track and one Railroad cross-buck sign.[105] Aside from these the only other warning given was an audible one, consisting of the blowing of the whistle and the ringing of the locomotive bell from a distance of 1,200 feet to the crossing.[106] Possibly because the car windows were closed except for the right front window being opened a slit of two inches,[107] and the five were talking and laughing [108] while the car radio was playing,[109] neither the whistle nor the bell was heard by the occupants of the car.[110]

There was no visual protection or warning at the crossing other than the signs.[111] Neither were there automatic signals, a watchman,[112] or a barrier.

While the record is burdened with references to the drinking of beer [113] and speed of the automobile,[114] there is nothing to show Daniels, the driver, was intoxicated.[115] It is found he was not intoxicated. Estimates of speed of the automobile at the time the danger became apparent varied from 40 miles an hour to 75 miles an hour with somewhere between 45 and 50 miles per hour being a close approximation of the true speed.

### Conclusions of Law

1. Nassau crossing is extremely hazardous. The hazardous condition is caused by: the large volume of automotive traffic using the highway, the irregular scheduling of defendant's trains, the angle at which track and road meet, the inability of train and vehicle to see each other because of obstructions to vision until close to the point where track and road intersect, and the archaic lighting system on defendant's freight train resulting in night running in virtual camouflage negating the benefit of any visibility remaining after clearance of the obstructions.

---

102. The locomotive contained a headlight, front and rear, R. 561. Only the front headlight was burning, R. 583, 623. However, because the track crossed the road at a 58° 30′ angle, the light would not reflect into the eyes of the driver of an automobile approaching from the north and consequently was not seen by the occupants of the Daniels car, R. 361, although seen by Alexander Vann, approaching from the opposite direction, R. 603.

The locomotive also contained walk-away lights, R. 561, instrument lights, R. 561, and hoodlights, R. 587, all of which were illuminated, R. 623, but which were not visible to automobile traffic, R. 586–587, 634, 635.

In addition, the locomotive contained small numeral lights on each side which are used to identify the engine at night, R. 570, 584. The numeral plates are 20 inches by 6¾ inches, lighted by two 75 volt, 50 watt lamps which illuminate the engine numerals being 5 inch high white numbers on a black background. Plaintiffs' Interrogatory No. 30 and Answer thereto.

Finally, the train contained cab lights

and marker lights which were not burning, R. 561, 583, 587.

103. R. 200.

104. "Reduce speed", "Speed limit 35", "Nassau", a circular highway approach warning sign for railroads and a highway marker painted on the surface of the highway, DX 11.

105. DX 11.

106. R. 532, 537, 541, 557, 559, 563, 597, 603, 607, 622, 664.

107. R. 270, 281, 360.

108. R. 284, 373.

109. R. 270, 285, 360, 376.

110. R. 288, 312, 331–332, 360, 376.

111. R. 223.

112. R. 222–223, 226–227.

113. R. 261, 273, 274, 277, 285, 303, 304, 305, 306, 325–326, 338, 353, 355, 356, 368, 418, 451.

114. R. 264, 268, 282, 283, 284, 309, 311–312, 328, 355, 357, 379, 380, 436, 437, 483, 484, 503, 504, 602, 629.

115. R. 418.

2. The Railroad either knew or should have known the crossing was unusually dangerous because of accidents prior to this one which had occurred at the crossing.[116]

3. The degree of care required of the Railroad to warn travelers on the highway of the approaching train, varies with the danger presented by the crossing.[117] At an ordinary grade crossing mere compliance with signals or warnings required by statute and/or the sounding of the whistle, or perhaps, the ringing of the bell might be sufficient. On the other hand, at some crossings, the duty devolves upon the Railroad to give other warnings in addition to the statutory warnings.[118] At peculiarly dangerous crossings, some more efficient means of warning, or even an obstruction to passage, might be necessary.[119] In every case, the duty to warn correspondingly increases with the danger presented.

4. The warnings given were not commensurate with the degree of risk involved.

5. The failure to give adequate warning constituted a violation of the duty owed by the Railroad to motor vehicle traffic.

6. Violation of the duty owed by the Railroad was a proximate cause of the collision between the Daniels automobile and defendant's train.

7. Defendant is not absolved from liability flowing from its violation of the duty owed to plaintiffs by reason of the general rule that a person who drives into the side of a train standing or moving over a grade crossing, cannot recover from the Railroad for injuries received.[120] This general rule has no application to the present facts. Where applied by the Delaware courts, there were not extraordinary or unusual circumstances rendering the crossing peculiarly hazardous. Further, where as here, a matter of a few seconds determined whether the car hit the train or the train the car, application of the general rule would result in reward to the winner of the race to the intersection. The result becomes even more intolerable when it is realized the rationale of the general rule sought to be applied by defendant is that ordinarily, the presence of the train upon the crossing is adequate notice to travelers that the crossing is preempted. In this case the train was not on the crossing so as to provide notice to highway travelers. Rather, it was in the act of completely obstructing the crossing when noticed by Daniels.

8. The contributory negligence of Daniels, the driver, and not a party in this case, resulting from drinking or speeding is not a bar to recovery by the plaintiffs. There is nothing in the record to indicate Daniels was intoxicated. Nor was such a claim seriously pursued. While there is evidence Daniels was exceeding the speed limit and the court so found, his speed was not so excessive so as to impute his negligence to plaintiffs. The duty of a passenger was set forth in Poynter v. Townsend, 1924, 3 W.W.Harr., Del., 51, 130 A. 678, as follows:

116. The court does not rule upon the admissibility of prior accidents as evidence tending to show an inherently dangerous crossing. The court considered the testimony of prior accidents only in connection with the issue of notice to the defendant. The court did not consider testimony of "near accidents" for any purpose whatsoever.

117. Leedom v. Pennsylvania R. Co., 1942, 3 Terry, Del., 186, 29 A.2d 171; Lofland's Brickyard Crossing Cases, 1914, 5 Boyce, Del., 150, 91 A. 285; Reed v. Queen Anne's R. Co., 1903, 4 Pennewill, Del., 413, 57 A. 529; cf. Jones v. Pennsylvania R. Co., 1948, 5 Terry, Del., 486, 61 A.2d 691 (where the crossing in and of itself was not inherently dangerous).

118. Id.

119. Leedom v. Pennsylvania R. Co., supra.

120. Gay v. Pennsylvania Railroad Co., 2 Cir., 1952, 199 F.2d 370, following Jones v. Pennsylvania R. Co., 1948, 5 Terry, Del., 486, 61 A.2d 691, and Philadelphia & R. Ry. Co. v. Dillon, 1921, 1 W.W.Harr., Del., 247, 114 A. 62, 15 A.L.R. 894.

"* * * the passenger is required to exercise due care and caution as well as the driver. However, the passenger is not held to the care that is required of the operator. The passenger has the right to rely, to a great extent, on the prudence, care, and skillfulness of the operator. * * * If the passenger sees the danger in time to avoid the accident, it is his duty to warn the operator. Or, if the passenger is in such position in the car that he must have seen the danger if he had used his sense of sight, as an ordinarily prudent passenger in such position would have done, and the accident happens because of the passenger's failure to see and warn the operator of the danger he must have seen, he would be guilty of contributory negligence. But we instruct you that a passenger is not required to do anything more than an ordinarily prudent person in a similar position and relation, who is not the operator, would have done in a like situation."

Any doubt as to whether the passengers fulfilled their duty is set to rest when it is remembered Kenneth Phillips both discovered and shouted a warning at about the same instant Daniels perceived the locomotive closing off his path of travel.

 9. Daniels' contributory negligence was not the sole proximate cause of the collision.

10. Since the defendant, Railroad, failed to fulfill a duty owed to plaintiffs and violation of that duty was a proximate cause of plaintiffs' injuries, it is concluded the Railroad was negligent.

11. Defendant has contested whether the widow may recover an amount of money which she will have to advance to rear an infant child, who, if the husband had not been killed would have been supported by the husband and father.

10 Delaware Code § 3704(b) provides:

"(b) Whenever death is occasioned by unlawful violence or negligence, and no suit is brought by the party injured to recover damages during his or her life, the widow or widower of any such deceased person, or, if there is no widow or widower, the personal representatives, may maintain an action for and recover damages for the death and loss thus occasioned."

By reason of being the natural guardian and by reason of 13 Delaware Code § 702, the legal duty to support the minor child shifted from the father to the mother plaintiff, if she is living and able, upon the death of the father.

 The question presented is whether the shift of the duty to support the child upon the father's death is recoverable as a damage "for the death and loss thus occasioned" within the meaning of 10 Delaware Code § 3704(b). The question is one of first impression in the State of Delaware. The duty of this court is to hold in the same manner as it believes the Delaware Court would rule in answer to the same question.

 A sense of fair play and justice virtually dictates a mother, by having to assume, if able, the burden of the *legal* obligation to support the child of the deceased father, has suffered a loss for which the tort-feasor should be responsible. Contrary to the Wrongful Death Statutes of many other States, the Delaware Statute, a part of the statutory law since 1866, limits recovery to the widow or widower for the loss occasioned. While the widow is forced to assume the burden of support, the loss to the child by reason of the wrongful death is that the child can no longer look to the father for support. Insofar as support of the child is concerned, it would superficially appear the child and not the widow has suffered the loss. Based on this tight reasoning, the loss of support by the child would not be a proper element of damages for the widow's recovery. The court declines to follow this harsh result in a case of first impression. It must be remembered 10 Delaware Code § 3704 (b) has been interpreted as providing,

"* * * a new and independent cause of action unknown to the Common Law. The action is not predicated upon the personal injuries sustained by the deceased, but rather upon his wrongful death and the loss occasioned thereby. Homiewicz v. Orlowski, 4 W.W.Harr. 66, 143 A. 250. The damages recoverable under this act are measured by the pecuniary loss occasioned to the named beneficiaries. (Citing cases.)" Coulson v. Shirks Motor Express Corporation, 1954, 9 Terry, Del., 561, 107 A.2d 922, 924.

Where the tort-feasor's negligence imposes upon the wife the burden of rearing an infant without financial aid from the husband, the wife has suffered a pecuniary loss as real and as vital as being deprived of her own support. "[The wife] should receive an award which would permit her to enjoy the same economic position she would have been in had her husband not been killed."[121] If Marvin Jester had not been killed his widow would not have the financial burden of raising their son. However, if this financial burden is thrust upon the tort-feasor by inclusion as part of the widow's damages, then, the widow insofar as the child is concerned will be able to enjoy the same economic position she would have been in had her husband not been killed.

The widow's loss is measured by that "portion of the gross earnings or income the plaintiff would probably have received from the deceased, as his wife, if he had lived."[122] The costs or expenses of the widow in rearing the child is immaterial. The amount recoverable by the widow is the amount the husband would have contributed towards the support of the child.

In holding the shift of duty to support the child upon the death of the father is a part of the loss occasioned by the father's death, the court is aware of Wood v. Philadelphia B. & W. R. Co.,[123] where, the jury, after it had retired to deliberate sent the following question to the court: "Will the court inform the jury if the plaintiff's child is to be considered in any way in this case?" The court replied, "* * * you should estimate her losses as a widow * * * and the child is not a factor in the case and should not be considered." The Wood case is not controlling because plaintiff deprived the court of considering the question by expressly limiting her claim for damages to the loss of the support which she would have received.

12. Where one has the right to recover expenditures incurred for nursing services necessitated by a personal injury resulting from another's negligence, has the one injured or his parents the right to recover the reasonable value of such services when furnished gratuitously[124] by his parents? The Delaware Courts have never directly passed on the issue. The decisions relating to this question reflect two views.[125] In one line of cases, the position is taken that the services were rendered for the benefit of the injured plaintiff; that the defendant wrongdoer should not be permitted to profit by any gratuity extended to his victim, and that consequently the reasonable value of such services may be recovered. The other line of cases adheres to a strict theory of damages, i. e., there can be no recovery for services rendered gratuitously because plaintiff has suffered no pecuniary loss.

The Delaware Courts, in speaking of damages generally and not in the context of gratuitous services would seemingly follow the rule that damages cannot be recovered unless there is an actual legal liability for the charge incurred.

121. Turcol v. Jenkins, 1956, 10 Terry, Del., 596, 122 A.2d 224, 225.

122. Lynch v. Lynch, 1937, 9 W.W.Harr., Del., 1, 195 A. 799, 804.

123. 1910, 1 Boyce, Del., 336, 76 A. 613, 617.

124. The services were gratuitous. R. 125: "They (the parents) have not rendered the boy any bill and they never will."

125. See Annotation: 128 A.L.R. 686, et seq.

In Girardo v. Wilmington & Philadelphia Traction Co.,[126] it was said:

"If you find a verdict for the plaintiff it should be for such an amount as would reasonably compensate her for the injuries sustained, including her pain and suffering, for any disability that has resulted from her injuries, and also for any expenditures, or charge incurred by her, and for which she made herself liable for medicine or medical attendance required on account of the injuries received in said accident."

In Kane v. Reed [127] the court stated:

"The amount of the judgment must be determined from the injuries which the plaintiff sustained as a result of the accident, including her pain and suffering, and the amount which she was required to spend to have her injuries properly treated and cared for * * *."

While this language indicates Delaware might follow that decisional law which precludes recovery because plaintiffs have suffered no pecuniary loss, it must be remembered the Girardo and Kane cases did not involve the question of recovery for the value of services gratuitously rendered. Consequently, the language found in those cases cannot be determinative of this question. The majority and generally accepted rule where gratuitous services are rendered to a child is that the value of such services is a compensative item of damage.[128] The minority rule has been vigorously criticized.[129] If the Delaware Courts were faced with this question, they would probably follow the more modern and generally accepted view.

It is concluded gratuitous nursing services rendered by a parent to a child are proper items of damage.

13. A claim for future institutional care of Jehu Evans is denied because of its speculative nature and because there is nothing in the Record to indicate the value of such services.

14. A question has arisen as to whether the parent or the patient may recover for amounts of money by which surgeons have reduced their bills because of the financial straits of those undertaking to pay the bill. The same considerations applicable to the problem of whether gratuitous nursing service is a proper element of compensatory damages are present.

The Restatement of Torts, § 924, Comment f, provides in part:

"The value of medical services made necessary by the tort can ordinarily be recovered although they have created no liability or expense to the injured person, as where a physician donates his services. Where a gift is intended to be made to the injured person its benefits should not inure to the tortfeasor * * *."

While there is authority to the contrary [130] this court is of the opinion the Delaware Courts would follow the view expressed in the Restatement for the reasons stated in the preceding section 12.

15. Telephone toll charges for calls made to a hospital to ascertain the condition of a patient is not an item of compensatory damages, since these calls were at most made to satisfy the minds of the parent and had no reasonable relation to the son's injury.

126. 1914, 5 Boyce, Del., 25, 90 A. 476, 478–479.

127. 1954, 9 Terry, Del., 266, 101 A.2d 800, 802.

128. Annotation: 128 A.L.R. 686 at 701.

129. Hudson v. Lazarus, 1954, 95 U.S. App.D.C. 16, 217 F.2d 344—see citations in footnote 8; Landon v. United States, 2 Cir., 1952, 197 F.2d 128; Plank v. Summers, 1954, 203 Md. 552, 102 A.2d 262; but cf. Coastal Tank Lines v. Canoles, 1955, 207 Md. 37, 113 A.2d 82.

130. Rigby v. Aetna Casualty & Surety Co., La.App.1933, 151 So. 119.

16. Defendant is liable to plaintiff, Margaret Jester, for the loss occasioned her by reason of the wrongful death of Marvin Jester. The measure of damages for the loss occasioned is that sum which she would have received from her husband during her lifetime, had he lived, reduced to present value. The measure of damages for the loss occasioned also include that sum, reduced to present value, which the husband would have contributed to the support of his minor child until the child reached the age of sixteen years.

17. Judgment should be entered in favor of Margaret Jester against defendant in the sum of $26,584, for the loss occasioned by the wrongful death of her husband, together with costs.

18. Defendant is liable to plaintiff, Jehu Evans, for all the injuries he suffered by reason of the collision on May 20, 1955, including all his temporary and whatever may prove to be permanent injuries, the reasonable value of past medical expenses, gratuitous nursing services, pain and suffering—past, present and future, past and future loss of wages.

19. Any claim for future institutional or nursing care is not included as an element of damages because the claim as presented in the Record is too speculative and because there is nothing in the Record upon which such a claim could be valued.

20. The defendant is liable to plaintiff, Jehu Evans, in the amount of $110,137.79, and judgment should be entered in favor of plaintiff, Jehu Evans, against defendant for said sum, together with costs.

21. Defendant is liable to plaintiff, Leland Kenneth Phillips, for all the injuries he suffered by reason of the collision on May 20, 1955, including all temporary and whatever may prove to be permanent injuries, the reasonable value of medical services, pain and suffering, and loss of wages.

22. Defendant is liable to plaintiff, Leland Kenneth Phillips, in the amount of $877.10, and judgment should be entered in favor of plaintiff, Leland Kenneth Phillips against defendant, for said sum, together with costs.

23. Defendant is liable to plaintiff, Noah Kenneth Collins for all the injuries he suffered by reason of the collision on May 20, 1955, including all temporary and whatever may prove to be permanent injuries, the reasonable value of medical services, pain and suffering—past, present and future, and loss of wages.

24. Defendant is liable to plaintiff, Noah Kenneth Collins in the amount of $7,844.48, and judgment should be entered in favor of plaintiff, Noah Kenneth Collins, against defendant, for said sum, together with costs.

An order in accordance herewith may be submitted.